**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PHYLLIS SHELTON-BALL,**
        **Plaintiff,**

**-vs-**                               **Case No. 6:04-cv-1869-Orl-19DAB**

**COMMISSIONER OF SOCIAL**
**SECURITY,**
        **Defendant.**
_____

**MEMORANDUM OPINION & ORDER**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **affirmed.**

### *I. BACKGROUND*

**A.    Procedural History**

Plaintiff filed for a period of disability, DIB and SSI benefits on March 8, 2002. R. 53-55. She alleged an onset of disability on August 20, 2001, due to depression, carpal tunnel syndrome, headaches, arthritis in the right knee, and fibromyalgia. R. 53, 359, 363, 366, 370. Her application was denied initially and upon reconsideration. R. 25-28. Plaintiff requested a hearing, which was

held on May 21, 2004, before Administrative Law Judge Franklin D. Holder (hereinafter referred to as the "ALJ"). R. 349-73. In a decision dated July 29, 2004, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 9-21. Plaintiff timely filed a Request for Review of the ALJ's decision. R. 7. The Appeals Council denied Plaintiff's request on October 29, 2004. R. 4-6. Plaintiff filed this action for judicial review on December 23, 2004. Doc. No. 1.

### B.     Medical History and Findings Summary

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of depression, carpal tunnel syndrome, headaches, arthritis, and fibromyalgia. Plaintiff testified that she has a high school education and two years of college. R. 352. Plaintiff worked as an administrative assistant from 1990 to 2000 at the University of Notre Dame until she was fired; she was accused of making threats to her former boss. R. 318. Prior to her employment at Notre Dame, Plaintiff was employed as a clerk typist/secretary from 1987 to 1990. R. 60, 73-75, 354-55. From December 2000 to April 2001, Plaintiff was employed as a secretary at Indiana University in South Bend, and from June to August 2001, she was employed as a trainer at a group home. R. 60.

After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from osteoarthritis of the knees, fibromyalgia, and recurrent severe major depressive disorder, treated and improved, which were "severe" medically determinable impairments, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 17. The ALJ found that Plaintiff's osteoarthritis of the knees did not prevent her from ambulating effectively as found in the musculoskeletal listing and that her depression did

not cause marked limitations in social functioning and marked deficiencies in concentration, persistence and pace as found in the mental listings. R. 17.

The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work, as she could lift twenty pounds, stand and walk two hours, and sit six hours in an eight-hour workday. R. 19. He also found Plaintiff had occasional postural limitations in climbing, balancing, stooping, kneeling, crouching and crawling. She also had mild restrictions on activities of daily living and social functioning, but no limitations on her ability to remember, understand and carry out simple instructions, or respond appropriately to changes in the work place. R. 19 The ALJ found that Plaintiff had moderate limitations in her ability to remember, understand, and carry out detailed instructions. R. 19. In making this determination, the ALJ found that Plaintiff's allegations and subjective symptoms are out of proportion and inconsistent with the medical evidence and are not fully credible for the reasons set forth in the body of the decision.[1] R. 19. Based upon Plaintiff's RFC, the ALJ determined that she could perform past relevant work as a clerk typist and secretary. R. 19. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 20.

Plaintiff now asserts that the ALJ erred by finding she had the RFC to perform her past relevant work contrary to treating and examining doctors' statements concerning her impairments. For the reasons that follow, the decision of the Commissioner is **AFFIRMED**.

---

[1] Within the body of the decision, the ALJ discredited Plaintiff's reported limitations based on several specific inconsistencies between those limits, medical findings and Plaintiff's stated daily activities. R. 19.

## *II.  STANDARD OF REVIEW*

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**RFC and the treating and examining physicians' opinions.**

Plaintiff claims that the ALJ should not have found her able to perform light work in spite of limitations assigned by treating and examining physicians who found Plaintiff's limitations (including mental impairments) were greater than those assigned by the ALJ. The Commissioner contends that

-4-

the ALJ considered the limitations assigned and gave them the proper weight in finding that Plaintiff could perform her past relevant work.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff contends the ALJ improperly based his finding that Plaintiff could perform her past relevant work on the opinions of non-examining physicians and disregarded the evidence of treating and examining physicians who found Plaintiff's limitations were greater than those assigned by the ALJ. Plaintiff contends that the limitations as found by examining physicians would not allow Plaintiff to perform her past relevant work.

As evidence of her physical impairments, Plaintiff points to the impairments listed in the May 23, 2002 consultative examination by Dr. Korman. Plaintiff contends that "during the examination"

she had "swelling in her hands, legs, and ankles with inflammation all over as well as constant joint pain," when, in actuality, these were symptoms reported by Plaintiff. R. 181 (in "history of present illnesses" section). Dr. Korman found no pedal edema, although he did find tenderness in Plaintiff's shoulders and paraspinal muscles and hips, but no comment on whether there was swelling in her legs or hands. R. 182 (*see* "Extremities" section). Plaintiff also points to Dr. Korman's report that Plaintiff had a "slow shuffling gait and was unable to walk heel to toe, tandem walk, or stoop." R. 182. Plaintiff had decreased range of motion in the cervical spine, dorsolumbar, shoulders, elbows, wrists, hips and knees, grip strength of 1/5 bilaterally and unable to button, zip and pick up coins. R. 182. Dr. Korman's impression was that Plaintiff had severe depression, fibromyalgia with occipital neuritis–plantar fasciitis, history of carpal tunnel syndrome, degenerative arthritis of the shoulders and knees, and was status post right knee surgery. R. 183. As the Commissioner points out, Plaintiff's muscle strength during the examination was 5/5, her nerves were intact, and her reflexes were 2/4. R. 183.

A couple of months later, Dr. Korman responded to an inquiry from SSA seeking a clarification of the grip strength and fine finger manipulation because his findings seemingly contradicted Plaintiff's responses on SSA forms that she cooks, does laundry, folds laundry, walks her dog, and drives. R. 179. SSA asked, "Please explain how she can do all these things with such poor grip and fine finger movements." R. 179. Dr. Korman responded "On the day of exam, her grip was very weak, and she was not able to button, zip, or pick up coins. She had numbness in fingertips but coordination was [within normal limits]. She possibly does the above chores but would have great difficulty on a bad day." R. 179.

For the argument that her limitations precluded her from returning to past relevant work, Plaintiff also relies on Dr. Elliott's psychological evaluation from June 5, 2002 in which he diagnosed Plaintiff with major depressive disorder, recurrent, severe with psychotic features (R. 185- 89) and Dr. Klion's June 27, 2002 Medical Review Technique Form which found Plaintiff moderately limited in

several areas. R. 208, 213-14.

The Commissioner responds that, as one-time examiners of Plaintiff, Dr. Korman and Gary Elliot, Ph.D., were not treating physicians; therefore, their opinions were not entitled to the great weight that may be accorded a treating physician's opinion, citing *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1160 (11th Cir. 2004) and *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). Plaintiff is incorrect in arguing that R. Klion, Ph.D., was an examining source or that the ALJ overlooked his opinion. Dr. Klion was a state agency psychologist who did not examine Plaintiff but reviewed her claim of disability on June 27, 2002; the ALJ specifically referred to the report from the state agency psychologist in determining Plaintiff's RFC. R. 18; 198-212.

As pointed out by the Commissioner, the ALJ did consider Dr. Korman's findings, but found that the medical evidence failed to show continued treatment or complaints in regards to her neck or upper extremities. R. 17. The ALJ also found:

> She has early osteoarthritis of the knees. However, the evidence does show much improvement with pain management. In fact, Dr. Schroeder reported that her condition was much improved in regards to sitting, standing, walking, lifting, carrying, and handling objects. Dr. Kristl's neurological examination showed her motor strength was 5/5 and her gait and coordination were within normal limits. She also carries a diagnosis for fibromyalgia; however, the evidence fails to show any active disease. Moreover, her activities of daily living would not be attributed to marked decreased grip strength. She is able to cook, do the laundry, garden, and read. Progress notes even show that she talks to friends through the internet and was using the computer to write a book. Moreover, she testified to no problems with sitting and

>   she could lift 20 pounds.  Furthermore, there are no limitations placed on the claimant from any treating source.  Therefore, the undersigned partially agrees with the State Agency that the claimant is capable of sitting six hours and lifting 20 pounds; however, due to her osteoarthritis of the knees, she would be limited to standing and walking two hours in an eight-hour workday (Social Security Ruling 96-6p).

R. 17-18.  The medical records bear out the ALJ's findings.  In April 2002, Dr. Schroeder of the Memorial Pain Control Center reported that, while Plaintiff had been treated for muscular neck and shoulder pain as well as occipital headaches in November and December 2001, at her last office visit three months before (on January 7, 2002) her condition was "much improved."  R. 163.  Dr. Schroeder opined, as far as her neck and shoulders were concerned, Plaintiff's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling was "good," although Plaintiff continued to have "multiple other problematic areas and pain complaints."  R. 163.

Dr. Korman noted Plaintiff's history of osteoarthritis in her knees.  However, records from the applicable time period two years prior to his consultative exam, August 1999 to 2001, from Plaintiff's treating physician, Dr. Deshpande, report that Plaintiff's pain responded to treatment with medication and, she had "good days and bad days," but she continued to "get by" on Oxycontin and "continued to do well," was finishing a novel, beginning a second novel, and did "significant amounts of volunteer work as well" in April 2001.  R. 131-38.

As the Commissioner points out, Plaintiff's narcotic pain medications were stopped in October 2001 when she was hospitalized for abusing her husband's prescribed OxyContin.  R. 160, 276. Plaintiff was not prescribed any pain medications again until March 2002, two months before Dr. Korman's evaluation, and even then it was not the narcotic OxyContin which Dr. Deshpande refused to prescribe for at least one year after the hospitalizations.  R. 129.  When Plaintiff was interviewed

by the SSA staff in July 8, 2002, she claimed not to be taking any pain medication because it upset her stomach. R. 100.

Subsequent medical records also indicate that Plaintiff's condition had improved in 2002. On May 15, 2002, Plaintiff reported "doing much better overall." R. 237. She had had cataract surgery on both eyes. R. 237. She was "very happy that things [were] getting better." R. 237. Dr. Chowhan's impression was that Plaintiff's major depression was "currently in remission." R. 237.

Most telling is Dr. Chowhan's comprehensive Report of Psychiatric Status from May 2002 which summarizes Plaintiff's two mental illness hospitalizations in August 2001 when she "shot her husband (presumably in a botched suicide attempt)." R. 247; *see also* R. 306. Dr. Chowhan (who had been treating Plaintiff since the incident) opined, "It is still unclear if she intended to use the gun on herself or on her husband (she was angry with him about a variety of things). She is not suicidal now and the legal system elected not to pursue any legal charges against her." R. 247.

On her second hospital admission in October 2001, Plaintiff "was quite psychotic." R. 247. "Though she adamantly denies it, there were guesses that she had been abusing her husband's pain medications." R. 247; R. 276; R. 280 ("she had been stealing her husband's OxyContine and was addicted to that.")[2]. Although her response to treatment had been "variable," Plaintiff appeared to be less depressed and responded well to the medications. R. 247. Dr. Chowhan reported that Plaintiff had shown steady progress, other than the second hospital admission. R. 247. In December 2001, Plaintiff reported no side effects to the medication; she also inquired about applying for disability. R. 266.

---

[2] Dr. Deshpande, who prescribed the OxyContin, was concerned about Plaintiff's "opiate tolerance" in May 1999 and tried to decrease it but was not able to until after the October 2001 hospitalization. R. 129, 141, 142.

As the Commissioner points out, psychiatric treatment notes for Plaintiff reveal her condition improved subsequent to the Fall 2001 hospitalizations and, by January 2002, her score on the Global Assessment of Functioning Scale (GAF) was 55. R. 260. In February 2002, she was getting outpatient therapy and "seemed to be improving." R. 255. She seemed to be "overcoming her depression and [was] looking for a job." R. 255. In March 2002, she was doing reasonably on her current medications and she was able to "write and read with full concentration and is able to retain it." R. 252. In April 2002, Dr. Kristl, Plaintiff's neurologist, prescribed water aerobics. R. 221.

By May 2002, one month before Dr. Elliot's consultative evaluation, Plaintiff's GAF score had risen to 60, according to Dr. Chowhan, Plaintiff's treating psychiatrist. R. 246. A GAF score of 55-60 indicates the presence of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 2000). In June 2002, Dr. Elliot noted Plaintiff's reported activities included cooking, laundry, sharing in cleaning responsibilities, and volunteering at a hospice. R. 188. She also had a driver's license and a bank account. R. 188. The psychologist did not identify any specific mental functional limitations that would interfere with Plaintiff's ability to work. In fact, Plaintiff said at that time that her psychotropic medications were effective in helping her "maintain" and keeping her from "going over the edge." R. 186.

It is not clear whether Dr. Klion, the state agency reviewing psychologist, had Dr. Chowhan's Report of Psychiatric Status from May 2002 in front of him when he concluded on June 27, 2002 that Plaintiff had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence or pace, with no episodes of decompensation. R. 208. On a mental functional capacity evaluation, Dr. Klion opined Plaintiff would have moderate

limitations in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions, and setting realistic goals or making plans independently of others. R. 213-24. Plaintiff was not significantly limited in all other areas of mental functioning. R. 213-14. The opinion and medical observations from Dr. Chowhan, as Plaintiff's treating psychiatrist, with the observations of Brenda Wetzel, Plaintiff's therapist, would certainly carry more weight than Dr. Klion's non-examining opinion or Dr. Elliot's one-time examination. R. 247.

Dr. Chowhan reported as to Plaintiff's mental abilities that she recalled all items testing her recent memory and her remote memory was "quite good," and her abstract thinking and judgment responses were mostly appropriate. R. 248. During the testing, Plaintiff bragged, "You know, I have an eidetic[3] memory." R. 247. Ms. Wetzel opined that Plaintiff would have trouble following any routine consistently and would have trouble getting to any work situation in the first place because of her chronic pain (by Plaintiff's report). R. 249. As to Plaintiff's progress, Ms. Wetzel opined that Plaintiff was clearly less depressed than when she began treatment and had responded well to the medications. R. 149. In July 2002, after Plaintiff complained to Dr. Chowhan about neck mucscle rigidity, he started her on Cogentin (R. 233), which Plaintiff reported was "working well." R. 231. In late September 2002, Plaintiff took an extended visit to her mother's out of state. R. 228.

After moving to Florida to live with her sister, Plaintiff began mental health treatment at Circles of Care in April 2003. R. 318-20. Dr. Baskaran noted that there was no evidence of any memory impairments and Plaintiff reported that she was "quite stable on the combination of her

---

[3]Marked by or involving extraordinarily accurate and vivid recall especially of visual images. American Heritage Dictionary (4th ed. 2000).

current medications" which had "good perceived effectiveness." R. 319, 325[4]. Upon examination, there was no evidence Plaintiff had any memory impairment and she was able to concentrate and maintain a good attention span. R. 319. Plaintiff's GAF score was 62 indicating that she was experiencing some mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well, and had some meaningful interpersonal relationships. *Id*. In October 2003, Plaintiff reported to the treating psychiatrist at Circles of Care, Dr. Baskaran, she was "doing well." R. 339. "The medications are working. Anxiety is under control. She has no depression. She is sleeping well." R. 339. Her anxiety was from living with a brother-in-law who was "nasty." R. 339.

In May 2004, Plaintiff reported being able to help with housework such as dusting, vacuuming, sweeping, laundry and cooking and to walk her dog, and she was trying to relearn how to ride a bike R. 362-66. These activities indicated Plaintiff's knee impairment was not associated with ongoing levels of disabling pain or functional limitations once her pain medication was resumed. The ALJ relied on the most recent medical evidence of Plaintiff's condition and good cause existed for the ALJ's failure to fully credit the opinions of Drs. Korman, Elliot, and Kloin.

### *IV. CONCLUSION*

The record in this case shows that Plaintiff does not enjoy full health and that her lifestyle and activities are affected by her ailments. Indeed, she is subject to numerous difficulties and there are uncertainties with respect to both her mental and physical capabilities and problems, the efficacy of prescribed treatments, side effects from those treatments, and Plaintiff's variable reaction to all those circumstances. At times, Plaintiff's condition undoubtedly precluded gainful employment on a

---

[4]Although Plaintiff denied an alcohol or substance abuse history to Circles of Care in April 2003, she had previously admitted to other treating physicians that she "used to have a drinking problem but quit 18 years ago. R. 325 & 319.

temporary basis. Differing conclusions could be drawn from the record evidence as to Plaintiff's current capacities, and her future ability to perform everyday activities on a sustained basis may change. The issue before the Court, however, is whether the ALJ's evaluation of the evidence of Plaintiff's condition at the relevant time was legally proper. The ALJ appropriately considered Plaintiff's circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act. For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on February 16, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record